IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
Case No.

| | |
|---|---|
| HANSEN BEVERAGE COMPANY,<br><br>Plaintiff,<br><br>v.<br><br>INNOVATION VENTURES, LLC d/b/a<br>LIVING ESSENTIALS, a Michigan Corporation,<br><br>Defendant. | **MOTION OF NON-PARTY, STEVE WALLACE TO QUASH SUBPOENA PURSUANT TO FED. R. CIV. P. 45(C)** |

Pursuant to Rule 45(c), Federal Rules of Civil Procedure, Non-party, Steve Wallace, moves to quash the subpoena dated March 2, 2009 served by Hansen Beverage Company, the plaintiff in the underlying action.

## I. INTRODUCTION

Hansen Beverage Company ("Hansen") issued a subpoena to Stephen W. Wallace, on March 2, 2009 to appear for a videotaped deposition and to produce documents on April 6, 2009. (*See* **Exhibit 1**). Mr. Wallace, a well-known NASCAR driver, appears in a commercial for Innovation Ventures, LLC ("Living Essentials"). He is not a party to the underlying action, nor does he have any information that will bear on the issues to be decided in that case. Hansen also issued subpoenas to Braylon Edwards and Osi Umenyiora, two well-known NFL football players that also provided celebrity endorsements for Living Essentials' 5 HOUR ENERGY® product. The only purpose served by issuing these subpoenas to these well-known celebrities is to annoy, embarrass, burden, and harass them in an effort to damage their relationships with Living Essentials.

By way of background, Hansen's central claim in the underlying action is that certain

Living Essentials' advertising claims are false and/or disparage Hansen's products. In short, Hansen asserts that Living Essentials' 5 HOUR ENERGY® product cannot provide energy because energy can only come from calories, of which 5 HOUR ENERGY® only has a few. Mr. Wallace does not have any knowledge of the science behind Living Essentials' 5-Hour Energy® products and has nothing to contribute to the advertising statements of which Hansen complains. Mr. Wallace's only possible connection to the claims in this litigation is providing his "celebrity endorsement" in television commercials and driving a car on which the product name and depiction appear. Significantly, the commercial featuring Mr. Wallace is not included among the numerous "offending" ads Hansen identifies in its Complaint.

Regardless, whether or not the statements Hansen complains of violate any of Hansen's rights will be determined through experts and scientific studies, not Mr. Wallace's relationship with Living Essentials. Indeed, it is counsel's understanding that each party in the underlying action has already designated experts in the relevant scientific fields to evaluate and opine on the veracity of the complained of advertising claims.

Relevant or not, all of the information that Hansen seeks from Mr. Wallace by way of its subpoena can be obtained directly from Living Essentials, thereby avoiding interference with Mr. Wallace's grueling NASCAR schedule, which comprises about a race a week from February through November, not including sponsorship commitments, practices, and qualifying that precedes each race. Balancing the interests of Mr. Wallace as against Hansen's in this matter clearly favors quashing the subpoena under Fed. R. Civ. P. 45(c).

In view of the foregoing, as more fully set forth below, the only purpose served by issuing the subject subpoena to Mr. Wallace is to annoy, embarrass, burden, and harass him. This Court should not countenance such litigation tactics.

2

Accordingly, Mr. Wallace moves to quash this subpoena because it subjects him to undue burden, expense, annoyance, and embarrassment. Under Fed. R. Civ. P. 45(c)(1) and (3), the Court should quash this subpoena.

## II. BACKGROUND FACTS

### A. The Underlying Litigation.

The underlying litigation involves Hansen's claims for false advertising and trade libel against defendant Living Essentials, pending in the Southern District of California (the "Litigation").

Hansen markets, among other things, a line of energy drinks under the name Monster Energy®. Living Essentials markets a liquid dietary supplement called 5-HOUR ENERGY®. Hansen asserts that Living Essentials is liable for false advertising and trade libel as a result of the advertising appearing on Living Essentials' products and in the media. Hansen alleges that Living Essentials' advertising is false because the 5 HOUR ENERGY® product cannot provide energy. Hansen asserts that energy can only come from calories, of which 5 HOUR ENERGY® only has a few. Hansen seeks damages for lost sales and an injunction.

Living Essentials denies that its advertising is false or misleading or that it has committed trade libel.

Early on in the case, Hansen moved for a preliminary injunction against Living Essentials based on Hansen's allegations made in its complaint, which was fully briefed by the parties and oral argument was heard. The injunction was *denied*, the Court finding that "plaintiff has not demonstrated a likelihood of success on the merits." (*See* Order Denying Plaintiff's Motion for Preliminary Injunction, at page 6, issued by the Court in the underlying case, a true and correct copy of which is attached hereto as **Exhibit 2**).

It is worthy to note that the above-referenced Order identified the central issues in this case, namely, whether, from a scientific standpoint, Living Essentials' product name "5-HOUR ENERGY®" and advertisements ("Hours of Energy Now" and "No Crash Later") are literally false. These issues were (and will be at trial) the subjects of much expert testimony based on scientific definitions, laboratory analysis, and clinical studies (as opposed to anecdotal testimonials).

It is also worth noting that, if it were to proceed, Mr. Wallace's deposition would be the *third* of three depositions of celebrity endorsers of Living Essentials' 5-Hour Energy® product.

### B. Mr. Wallace's Celebrity Endorsement Ad.

Mr. Wallace provides a "celebrity endorsement" for Living Essentials' 5-Hour Energy® product. In a televised commercial[1], joined by his father, legendary racecar driver Rusty Wallace. Mr. Wallace and his father state as follows:

> Steve: Hey, Rusty — what did you think when I brought those 5-Hour Energy® shots.
>
> Rusty: It looks like that you switched on to me. It looks like you are focusing more — so that kinda sold me on it.
>
> S: Well that was just a 2-oz. shot and I took it. It really helped me focus here in the racecar and the especially after the race, I felt really good after, I wasn't tired.
>
> R: I want to tell you something buddy, as much money as I've been spending on this old car — you need to stay focused.
>
> S: I know, right?
>
> R: Is that going to save you money if you're focusing more?
>
> S: It should because a shot's only 3 bucks and a new race car's about 150 grand — so I think it will help me out more.

---

[1] The commercial can be viewed at http://www.youtube.com/watch?v=OCLk8oyYXlg.

R: That's a good idea. I like that.
S: 5-Hour Energy® — I use it; I love it.

### C. Mr. Wallace's Short Biography.

Steve Wallace, son of famous racecar driver and ESPN announcer Rusty Wallace, drives the #66 USfidelis/5-Hour Energy® Chevrolet Car for Rusty Wallace Racing. Mr. Wallace has been an accomplished race car driver from a young age, winning the Summer Shootout twice and the Winter Shootout once at Lowe's Motor Speedway. Mr. Wallace also won the Snowball Derby in Pensacola, Florida. In 2004, Mr. Wallace was named the UARA Rookie of the Year. He began racing in NASCAR in 2006 when he raced 17 races in the Top-Flite #64 Dodge Nationwide Series car. He began racing NASCAR full time in 2007. In his very young career he has already won two poles as well and has a top-five finish to his credit.

The NASCAR national touring series schedules are comprised of events across the United States and Canada on a near weekly basis, beginning in February and concluding in November. In 2008, between February 16, 2008 and November 15, 2008, Mr. Wallace raced in 35 races nationwide, about one race a week every week from February to November. His 2009 schedule is expected to be equally busy, with his next two races scheduled for March 21, 2009 at Bristol Speedway in Tennessee and April 4, 2009 at Texas Motor Speedway in Texas. (A true and correct copy of a printout of the 2009 NASCAR Nationwide Series schedule from www.nascar.com is attached hereto for the Court's convenience as **Exhibit 3**).

Due to his celebrity, he has landed numerous endorsement deals and sponsors, appeared in commercials, and made numerous television appearances off of the track.

D. **The Hansen Subpoena.**

The Hansen subpoena seeks both Mr. Wallace's testimony and the production of documents. (*See* **Exhibit 1** hereto). The documents demanded are extremely broad in requesting "all documents" and "all communications" exchanged between Mr. Wallace and Living Essentials. Even putting aside the fact that the subpoena contains overly broad document categories, it seeks documents that could be obtained directly from Living Essentials.

III. **THIS COURT SHOULD QUASH THE SUBPOENA *IN TOTO***

Hansen's subpoena must be quashed as a matter of law because it subjects Mr. Wallace to "undue burden." The discovery sought from him is not limited in any manner and is neither relevant nor necessary to the underlying action.

Rule 45 provides that a court shall quash (or modify) a subpoena if it "subjects a person to undue burden." F.R.C.P. 45(c)(3)(A)(iv). Whether a subpoena subjects a witness to undue burden generally raises a question of the subpoena's reasonableness, which "requires a court to balance the interests served by demanding compliance with the subpoena against the interests furthered by quashing it." 9A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2463 (2d ed.1995). "[T]his balance of the subpoena's benefits and burdens calls upon the court to consider whether the information is necessary and unavailable from any other source." *Id.* Where the witness has no personal testimony relevant to the case and the information sought is readily obtainable from other sources, the court may justifiably quash the subpoena. *Positive Black Talk Inc. v. Cash Money Records, Inc.*, 394 F.3d 357, 377 (5th Cir. 2004).

Balancing the interests of Mr. Wallace as against Hansen's in this matter clearly favors quashing the subpoena under Fed. R. Civ. P. 45(c).

6

### A. Having to Appear for Deposition and/or Produce Documents in Response to the Subpoena Places an Undue Burden on Mr. Wallace.

Due to his rigorous schedule, having to set aside a day to submit to deposition and additional time to gather and produce documents would place an undue burden on Mr. Wallace – especially whereas here the testimony and documents sought are unnecessary and can be obtained from other less burdensome sources. As set forth above, Mr. Wallace is a professional racecar driver who is presently in the thick of the 2009 nationwide NASCAR tour across numerous U.S. States and Canada, with a race about every week from February through November. Before each race, Mr. Wallace must take part in pre-arranged, sponsorship commitments, multiple practice runs with his team and qualifying. Mr. Wallace cannot afford to disturb his grueling schedule and his obligations to his team by having to comply with the subject subpoena, which seeks information that is tangential – at best – to the issues in this case.

Indeed, the noticed date in the subpoena of April 6, 2009 is sandwiched between two races, one scheduled for April 4, 2009 at Texas Motor Speedway in Texas, and the other on April 11, 2009 at Nashville Superspeedway in Tennessee. (*See* **Exhibit 3** hereto). Having to appear for the noticed deposition could severely hamper his ability to compete in these races and cost his team significant amounts of money.

Hansen does not know yet whether it first could obtain from Living Essentials the information it now seeks from Mr. Wallace — because it has not yet tried. As stated above, Mr. Wallace's deposition would be only the *third* deposition in the case — preceded by two other Living Essentials' celebrity spokespersons. Critically, however, Mr. Wallace has been informed that Hansen only recently served discovery requests on Living Essentials — responses are not due until after the scheduled depositions. One would expect that Hansen would want to take discovery from Living Essentials *before* troubling third-parties for information that would, in all

7
Case 3:09-mc-00048-RJC-DSC   Document 1   Filed 03/31/09   Page 7 of 11

likelihood, prove unnecessary.

Summoning Mr. Wallace to appear for deposition and to produce documents only serves to place a burden on him, annoy him, and force him to retain an attorney to represent him at the deposition, which would involve a significant expense.

### B. Mr. Wallace Has No Information Relevant To Hansen's Claims Asserted in the Litigation.

Any potential testimony by Mr. Wallace will not bear on any of the asserted claims in the underlying litigation. At the outset, it should be noted that Mr. Wallace is not named in either party's initial disclosures or discovery responses. Significantly, although the Complaint identifies numerous advertisements of which Hansen complains, Mr. Wallace's statements made in his celebrity endorsement advertisement do not appear among them. Had the ad in which Mr. Wallace appears been at issue in this litigation, one would expect Hansen to have specifically identified it in its Complaint.

As can be gleaned from the above-referenced Order Denying Plaintiff's Motion for Preliminary Injunction (**Exhibit 2** hereto), the main issues in this case are whether, from a scientific standpoint, Living Essentials' mark "5-HOUR ENERGY®" and advertisements ("Hours of Energy Now" and "No Crash Later") are literally false.[2] These issues were (and will be at trial) the subjects of much expert testimony based on scientific definitions, laboratory analysis, and clinical studies (as opposed to anecdotal testimonials).

---

[2] The elements of a Lanham Act § 43(a) false advertising claim are: (1) a false statement of fact by the defendant in a commercial advertisement about its own or another's product; (2) the statement actually deceived or has the tendency to deceive a substantial segment of its audience; (3) the deception is material, in that it is likely to influence the purchasing decision; (4) the defendant caused its false statement to enter interstate commerce; and (5) the plaintiff has been or is likely to be injured as a result of the false statement, either by direct diversion of sales from itself to defendant or by a lessening of the goodwill associated with its products. *Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1139 (9th Cir. 1997). To demonstrate falsity within the meaning of the Lanham Act, a plaintiff may show that the statement was literally false, either on its face or by necessary implication, or that the statement was literally true but likely to mislead or confuse consumers. *Id.*

Mr. Wallace has no personal knowledge of the matters relevant to this action; his anecdotal statements made in the above-detailed celebrity endorsement do not go to the truth or falsity of the statements complained of by Hansen, which do not include among them Mr. Wallace's statements. The only statement made in his television commercial regarding the performance of Living Essentials' product is personal opinion, specifically, "It really helped me focus here in the race car and especially after the race, I felt really good after, I wasn't tired." What Mr. Wallace likes or feels cannot be open to debate. Hansen will have to resort to experts and scientific evidence at trial, as Hansen did in its failed Motion for Preliminary Injunction, to address the truth or falsity of Living Essentials' advertising statements. The harassment of Mr. Wallace is not necessary.

### C. The Information Sought Is Available From Other Less Burdensome Sources.

Hansen can obtain testimony and documents regarding the substantiation for the advertising claims at issue in this case directly from Living Essentials and its designated experts in the underlying action. For example, all of the documents sought from Mr. Wallace, to the extent they exist – putting aside their questionable relevance to the claims and defenses being asserted in the Litigation – could be sought directly from Living Essentials through document demands. For example, Document Request Nos. 1-3 relate to documents and communications exchanged between Living Essentials and Mr. Wallace. Any document could be equally sought directly from Living Essentials without burdening Mr. Wallace. Document Request No. 4 requests "All communications ... related to the 5-Hour Energy shot." However, as to the requests, Mr. Wallace is not aware of any responsive documents in his possession, custody or control.

The only remaining document request asks for "All documents related to any tests

performed by Stephen William Wallace with respect to the 5-Hour Energy shot." Aside from being vague, this demand assumes that Mr. Wallace conducted "tests" beyond merely consuming the product. There were no "tests" that were explicitly referenced or implied in Mr. Wallace statement of his opinion regarding how the 5-Hour Energy product makes him feel. Hansen knows well that Mr. Wallace did not perform "tests," aside from drinking the product. Again, what Mr. Wallace likes or feels cannot be open to debate.

If Hansen's concern is authenticating the commercial featuring Mr. Wallace, that too can be done by other means – without involving Mr. Wallace.

The subpoena serves no legitimate purpose, as all of the information (whether testimonial or documentary) sought – even putting aside its questionable relevancy to the claims and defenses at issue in the underlying Litigation – can be sought from sources other than Mr. Wallace.

## IV. CONCLUSION

Non-party Steve Wallace respectfully requests that this Court enter an order quashing the subpoena for his deposition testimony and production of document on April 6, 2009. Mr. Wallace additionally requests his costs and attorney fees for having to move to quash this frivolous subpoena.

Respectfully submitted this 31st day of March, 2009.

s/ G. Michael Barnhill
G. Michael Barnhill, N.C. Bar #9690
James K. Phillips, N.C. Bar #7967
**WOMBLE CARLYLE SANDRIDGE & RICE**
*A Professional Limited Liability Company*
One Wachovia Center
301 South College Street, Suite 3500
Charlotte, NC 28202
(704) 331-4900
*Attorney for Steve Wallace*

# CERTIFICATE OF SERVICE

I hereby certify that on the 31st day of March, 2009, I electronically filed **MOTION OF NON-PARTY, STEVE WALLACE TO QUASH SUBPOENA PURSUANT TO FED. R. CIV. P. 45(C)** with the Clerk of Court using the CM/ECF System which will send notification of such filing to the following:

Mark A. Cantor, Esq.
Mark Lorelli, Esq.
Thomas W. Cunningham, Esq.
Brooks Kushman, P.C.
1000 Town Center, 22nd Floor
Southfield, MI 48075
Telephone: (248) 358-4400
Facsimile: (248) 358-3351
mcantor@brookskushman.com
mlorelli@brookskushman.com
tcunningham@brookskushman.com

*Attorneys for Innovation Ventures, LLC d/b/a Living Essentials*

Daniel T. Pascucci, Esq.
Nathan R. Hamler, Esq.
Mintz Levin Cohn Ferris Glovsky and Popeo, P.C.
3580 Carmel Mountain Rd., Suite 300
San Diego, CA 92130
Telephone: (858) 314-1510
Facsimile: (858) 314-1501
dpascucci@mintz.com
nhamler@mintz.com

*Attorneys for Innovation Ventures, LLC d/b/a Living Essentials*

Mark B. Mizrahi, Esq.
Brooks Kushman, P.C.
Howard Hughes Center
6100 Center Drive, Suite 630
Los Angeles, CA 90045
Telephone: (310) 348-8200
Facsimile: (310) 846-4799
mmizrahi@brookskushman.com

*Attorney for Innovation Ventures, LLC d/b/a Living Essentials*

Norman L. Smith, Esq.
Edward J. McIntyre, Esq.
Alison L. Pivonka, Esq.
Solomon Ward Seidenwurm & Smith, LLP
401 B Street, Suite 1200
San Diego, CA 92101
Telephone: (619) 231-0303
Facsimile: (619) 231-4755

*Attorneys for Hansen Beverage Company*

s/ G. Michael Barnhill
G. Michael Barnhill
